IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL DWAYNE ROGERS,                )
                                      )
            Plaintiff,                )
                                      )
    v.                                )   1:19CV417
                                      )
NORTH CAROLINA DEPARTMENT             )
OF PUBLIC SAFETY, et al.,             )
                                      )
            Defendants.               )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court for a recommended ruling on Defendants Betty Brown and Chris Rich's motion for summary judgment. (Docket Entry 46.) Plaintiff Michael Dwayne Rogers filed a brief in opposition to Defendants' motion. (Docket Entry 50.) For the reasons that follow, the undersigned will recommend that Defendants' motion for summary judgment be granted.

## I. BACKGROUND

Plaintiff, a *pro se* state prisoner in the custody of the North Carolina Department of Public Safety ("NCDPS") and self-proclaimed member of the Nation of Islam ("NOI"), filed a Complaint pursuant to 42 U.S.C. § 1983 alleging violations of his rights under the First and Fourteenth Amendments of the United States Constitution, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"), and the North Carolina Constitution. (*See* Complaint, Docket Entry 2; *see also* Am. Complaint, Docket Entry 18.) As

to the remaining Defendants,[1] Plaintiff alleges that he was improperly validated as a member of the Security Risk Group ("SRG") Five Percent Nation of Gods and Earths ("NGE") in 1998, and Defendant Rich refused to close Plaintiff's file in July 2018 despite the recommendation of SRG officers and as required by prison policy. (*See* Am. Compl. ¶¶ 11-15, 20-23, 26, 28.) As a result of his continued gang member status, Plaintiff's religious practices were substantially harmed, he has been denied minimum custody benefits, his rehabilitation efforts have been limited, and he has not had a fair opportunity at parole. (*See id.* ¶¶ 25, 27, 31, 33-34.) In addition, Plaintiff alleges that Defendant Brown has substantially burdened his religious rights by prohibiting programs and services devoted to the NOI, though services are available for other religious organizations. (*Id.* ¶¶ 18-19, 35.)

On September 27, 2021, Defendants Brown and Rich filed a motion for summary judgment arguing that Plaintiff cannot establish a genuine issue of material fact that Defendants violated his constitutional rights. (Docket Entry 46.) In support of Defendants' motion, they submitted affidavits on their own behalf along with NCDPS's policies and procedures regarding religious services. (*See* Betty Brown Affidavit ("Brown Aff."), Docket Entry 48-1; Chris Rich Affidavit ("Rich Aff."), Docket Entry 48-3; NCDPS Policy & Procedures for Religious Services ("Religious Services Policy"), Docket Entry 48-2.)

As the Director of Chaplaincy Services during the relevant time herein, Defendant Brown's duties and responsibilities include formulating and providing professional supervision of chaplaincy services. (Brown Aff. ¶ 7(a).) More specifically, she provides guidance and

---

[1] All other Defendants have been terminated from this action. (*See* Docket Entries 21, 28.)

2

Case 1:19-cv-00417-WO-JLW   Document 51   Filed 08/11/22   Page 2 of 17

assistance for the religious programs and services to all the facilities within North Carolina prisons. (*Id.*; *see also* Religious Services Policy § .0101(a).)

Defendant Brown is the chair of the Religious Practices Committee ("RPC"), a group that determines the creation or modification of religious practices policy, with approval of the Commissioner of Prisons. (Brown Aff. ¶ 8.) The RPC also reviews and makes recommendations regarding a prisoner's requests for a religion that is not officially accommodated by the NCDPS. (*Id.* ¶ 9; *see also* Religious Services Policy § .0108(b).) The RPC considers several things when assessing a new religion including whether requested practices or paraphernalia have a recognized role in the faith practice and are sincerely sought for religious reasons, conflicts with valid penological interests, prison accommodation means, and duplication of existing services. (Brown Aff. ¶ 9.) Defendant Brown states that the RPC must balance many governmental interests "in a manner least restrictive of inmate religious freedom." (*Id.* ¶ 10.) She further states that varying accommodations are made for different faith groups because of the unique and individualized nature of religious beliefs in each religious group. (*Id.* ¶ 11.) Ultimately, each faith practice is analyzed separately as the tenets of each faith practice are different. (*Id.*)

Defendant Brown further avers that the NOI is not a recognized religious group that can hold services within NCDPS facilities. (*Id.* ¶ 14.) Rather, the RPC concluded that Plaintiff's request to practice the NOI could be met through the Islamic services currently provided pursuant to NCDPS policy and any individual needs could be experienced through private devotion in his cell. (*Id.* ¶¶ 15-16.) Defendant Brown also states that Plaintiff was advised that the prison facility would accommodate his faith through publications that he

3

could purchase. (*Id.* ¶ 17.) However, preapproval was required for any books ordered. (*Id.*) Lastly, Defendant Brown contends that she had no personal involvement in Plaintiff's SRG designation nor does the chaplaincy services make decisions concerning gang classification of prisoners. (*Id.* ¶¶ 20-21.)

Defendant Rich noted that he was previously employed[2] by the NCDPS as an Intelligence Manager/Criminal Analyst of the Special Operations and Intelligence Unit ("SOIU") located in Raleigh, North Carolina. (Rich Aff. ¶ 4.) His duties and responsibilities included overseeing the SRG validation and assessment process, helping oversee SRG programs and policy, gathering and disseminating criminal intelligence, and working with both internal and external entities for investigative purposes. (*Id.* ¶ 5.) He further states that the NCDPS Security Manual specifically defines Security Threat Group ("STG")[3] associates to include those known to participate in the illegal activities of a STG and also those inmates "being watched or observed to gather evidence or intelligence to support validation as an STG/STI member." (*Id.* ¶ 10.) Defendant Rich explained that an inmate is initially given a STG designation based on extensive research and documentation of a member's behavior by facility intelligence officers in the field. (*Id.* ¶ 9.) The facility intelligence officer then completes an investigation which is subject to review by the facility head, and prior to "validation," the prisoner receives notification of their validation with an opportunity to dispute it. (*Id.*) Once

---

[2] At the time of the filing of the affidavit, Defendant Rich was employed by the NCDPS as a Strategic Planning Coordinator. (Rich Aff. ¶ 4.)

[3] Defendant Rich has referenced both SRG and STG in his affidavit. (*See* Rich Aff. ¶¶ 5, 7, 8, 10, 12.) STG appears to be former name for the SRG. (*See* Brown Aff. ¶ 20 ("SRG (Security Risk Group) formally STG (Security Threat Group)").)

4

an inmate is validated, they are reviewed annually by the SOIU to determine whether their validation level is accurate or whether it should be modified. (*Id.* ¶ 12.) Prisoners are not aware of the timing of the annual review nor the results which remain confidential for security concerns. (*Id.*)

Defendant Rich avers that Plaintiff's validation as an NGE member was supported by sufficient evidence, per policy in 1998. (*Id.* ¶ 11.) Further, Defendant Rich asserts that Plaintiff's validation was continuously reviewed since 2015, he continued to meet the criteria for validation, and has remained validated throughout his incarceration. (*Id.* ¶¶ 12-14.) As to the NGE, Defendant Rich states that it has remained an SRG in North Carolina due to their history of violence and illegal activity within the prison system and their core beliefs which lends itself to racial supremacy, cultural division, and extremism. (*Id.* ¶ 16.) Defendant Rich states that Plaintiff has been in possession of materials that has met the criteria of a SRG, and allowance of NGE material would ultimately compromise the security of the prison facilities and the public. (*Id.* ¶¶ 15, 17-19.) Finally, Defendant Rich states that the NCDPS was in the process of developing a new policy to allow renunciation of SRG membership by SRG validated inmates. (*Id.* ¶ 21.) However, the policy was not yet in place during his final review of Plaintiff's file in July 2017. (*Id.*)

In response to the motion for summary judgment, Plaintiff reasserts his contentions regarding his improper SRG validation and the substantial burdens on his religious rights. (*See* Docket Entry 50 at 1-18.)[4] Plaintiff submitted a declaration on his own behalf along with the

---

[4] Unless otherwise noted, all citations in this recommendation refer to the page numbers at the bottom right-hand corner of the documents as they appear in the Court's CM/ECF system.

declaration of his brother, Roy Anthony. (*See* Michael Rogers Declaration ("Rogers Decl."), Docket Entry 50 at 23-36; Roy Anthony Declaration ("Anthony Decl."), Docket Entry 50 at 37-38.)

## II. DISCUSSION

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F. 3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere

6

allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson*, 477 U.S. at 248-49.

**A. First Amendment & RLUIPA Claims**

1. Substantial Burden

Defendants contend that summary judgment should be granted in their favor as to Plaintiff's RLUIPA and First Amendment claims because Plaintiff cannot demonstrate that the conditions he faced, nor the policies of the NCDPS, placed a substantial burden on his right to free exercise of his religion. (*See* Docket Entry 47 at 5-13.) The Free Exercise Clause of the First Amendment guarantees inmates a "reasonable opportunity" to practice their religion. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). The Supreme Court of the United States has applied the First Amendment to the states through the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). A prisoner does not enjoy the same full range of freedoms as those not incarcerated; rather, state action violates a prisoner's constitutional rights if it burdens a prisoner's religious rights and is not reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether alternatives for exercising the right remain to the prisoner; (3) what effect accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Id.* at 89-91.

7

Applying a more stringent protection, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person" serves to further a compelling government interest and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1. In order to determine whether there has been a violation under RLUIPA, Plaintiff "bears the burden of establishing a prima facie case, showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged conduct substantially burdens that exercise." *Krieger v. Brown*, 496 F. App'x 322, 324 (4th Cir. 2012).

Following the Supreme Court's guidance, the Fourth Circuit has held that "a substantial burden on religious exercise occurs when a state or local government, through act or omission, put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotations and citations omitted). In contrast, "[n]o substantial burden occurs if the government action merely makes the religious exercise more expensive or difficult, but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion." *Dellinger v. Clarke*, 172 F. Supp. 3d 898, 902-03 (W.D.Va. 2016) (internal quotations and citation omitted). Upon Plaintiff establishing a prima facie case, the burden shifts to the government to show "that the limitation on the plaintiff's religious exercise is the least restrictive means of furthering a compelling government interest." *Krieger*, 496 F. App'x at 324. "In assessing

[whether there is a substantial] burden, courts must not judge the significance of the particular belief or practice in question." *Lovelace*, 472 F.3d at 187 n.2.

Here, Plaintiff has not established that Defendants' actions imposed a substantial burden on the ability to exercise his religion. Although the NOI is not a recognized religious group within NCDPS facilities, NCDPS's religious policy provided alternative means for Plaintiff to exercise his religion through Islamic services and any individual needs could be experienced through private devotion in his cell. (*See* Brown Aff. ¶¶ 14-16.) In addition, Plaintiff was advised that the facility would accommodate his faith through publications that he could purchase with preapproval. (*Id.* ¶ 17.) These accommodations do not demonstrate a substantial burden on Plaintiff's free exercise of his religion.

Plaintiff contends that Defendants' alternative means for religious accommodations through Islamic services are insufficient because NOI's theology conflicts with the Islamic services provided. (Rogers Decl. ¶ 12, Docket Entry 50 at 31.) Plaintiff's concerns regarding Defendants' accommodations reveal an impediment that does not rise to the level of a substantial burden. Even if it were such that NOI's theology differed from the Islamic services at the NCDPS facilities, Plaintiff still could engage in his religious exercise through private devotion and could purchase publications with preapproval. Ultimately, while the Court acknowledges Plaintiff's zealous genuine beliefs in his faith (*see id.* ¶¶ 3-12, 16-17), he has not established that he was pressured to violate or abandon these beliefs by Defendants. *See Dellinger*, 172 F. Supp. 3d at 902-03 ("[N]o substantial burden occurs if the government action merely makes the religious exercise more expensive or difficult, but fails to pressure the

9

adherent to violate his or her religious beliefs or abandon one of the precepts of his religion.").

In sum, there is no genuine issue of material fact as to whether Plaintiff's religious practice has been substantially burdened by Defendants.[5] Moreover, even if this Court were to find that Plaintiff has met this burden, Defendants have a compelling governmental interest in prison safety and security and have shown that this is the least restrictive means available to accomplish such interests.[6]

---

[5] The undersigned further concludes that Plaintiff cannot demonstrate that Defendants' acts were conscious or intentional rather than negligent. *See Cherry v. Platt*, No. 3:10-CV-629-RJC, 2012 WL 868897, at *6 (W.D.N.C. Mar. 13, 2012) (unpublished) ("Although inmates clearly retain their First Amendment right to free exercise of religion in prison, 'negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause.'") (citing *Lovelace*, 472 F.3d at 201); *Muwwakkil v. Johnson*, No. 7:09CV00318, 2010 WL 3585983, at *7 (W.D. Va. Sept. 13, 2010) (unpublished) (Plaintiff "fails to demonstrate that prison officials knew that denial of the requested property items . . . substantially burdened [plaintiff's] religious practice . . . Without knowledge that the property restriction substantially burdened [plaintiff's] religious practices, the defendants' alleged actions . . . did not violate the First Amendment or RLUIPA.") (footnote omitted), *aff'd*, 407 F. App'x 685 (4th Cir. 2011).

Consistent with the same principles, any separate Equal Protection claim against Defendants Brown and Rich fail as a matter of law because Plaintiff has not established that said Defendants acted with the requisite discriminatory *intent*. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F. 3d 648, 654 (4th Cir. 2001). Plaintiff has not done so here. *See C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) ("[A] plaintiff alleging an Equal Protection violation actionable under § 1983 must establish that the differential treatment it was afforded was intentional, not the result of mere negligence.").

[6] To the extent Plaintiff affirmatively alleges and argues that he is not a member of a gang, and specifically not a member of the NGE (*see* Am. Compl. ¶ 17; Rogers Decl. ¶ 9), he lacks standing to challenge the NGE as a SRG or to have it recognized as a religion. *See Rogers v. Stanback*, No. 1:13CV209, 2013 WL 6729864, at *2 n.4 (M.D.N.C. Dec. 19, 2013) (unpublished). However, to the extent Plaintiff asserts that he is "validated" as NGE and "has a right to defend his religion" (Am. Compl. ¶ 17; *see also* Rogers Decl. ¶ 9), the Court assumes that the NGE is a religious group entitled to First Amendment protection. *See Rogers v. Jackson*, No. 5:15-CT-3092-FL, 2017 WL 4246866, at *7 (E.D.N.C. Sept. 25, 2017) (unpublished). However, as further discussed herein, Defendants have shown that the prohibition on both the NOI and NGE further a compelling governmental interest

10

## 2. Compelling Government Interest and Least Restrictive Means

Assuming *arguendo* that Plaintiff's religious practices have been substantially burdened, to defeat the more stringent protections under RLUIPA Defendants must demonstrate "that the limitation on the plaintiff's religious exercise is the least restrictive means of furthering a compelling government interest." *Krieger*, 496 F. App'x at 324. Defendants argue that the NCDPS's restrictions on the NOI is the least restrictive means to serve the compelling interest of preserving security and safety from the threat posed by such organization. (Docket Entry 47 at 13-15.) The Fourth Circuit in *Lovelace* recognized that "good order, security and discipline" are valid concerns of prison officials, and "security deserves particular sensitivity." 472 F.3d at 190 (internal quotations and citations omitted).

Specifically here, Defendant Rich contends that the NGE has a "history of violence and illegal activity within the prison system and their core beliefs lends itself to racial supremacy, cultural division, and extremism." (Rich Aff. ¶ 16.) Allowing Plaintiff to possess materials associated with a SRG presents security risks and safety concerns. (*See id.* ¶¶ 17-19.) Even if deemed a substantial burden, the prohibitions on the NGE and NOI further compelling governmental interests of safety and security. And such prohibitions have not prevented Plaintiff from religious worship through access to Islamic services, private devotion, and preapproved publications.

Indeed, in a similar case, another district court within North Carolina already held that "the prohibition on [NGE] Five Percenters and NOI furthers a compelling governmental

---

with no lesser alternative means to accomplish such. Thus, Defendants are entitled to summary judgment on Plaintiff's First Amendment and RLUIPA claims.

11

interest, which is the safety of inmates." *Rogers*, 2017 WL 4246866, at *9. Further, the Fourth Circuit has "observed that a federal intelligence summary concluded the Five Percenters were 'a radical Islamic sect/criminal group that is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric.'" *Incumaa v. Stirling*, 791 F.3d 517, 520 n.3 (4th Cir. 2015), *as amended* (July 7, 2015).[7] Ultimately, based on the evidence presented here, considered in the light most favorable to Plaintiff, the NCDPS's measures in restricting the programs and services of the NOI and the prohibition on the NGE are the least restrictive means to serve their compelling and penological interest in institutional security and safety. Thus, Plaintiff's RLUIPA and First Amendment[8] claims fail.[9]

### B. Due Process Claim

Plaintiff asserts that he was deprived of due process because his continued gang member status has caused him atypical and significant hardship including the inability to rehabilitate himself and the lack of a fair opportunity at parole. (*See* Am. Compl. ¶¶ 25, 27, 30-32, 34.) Defendants Brown and Rich contend that Plaintiff has not and cannot present

---

[7] The NGE has been recognized as a religion in some states and district courts. *See Miles v. Guice*, No. 5:13-CT-3193-FL, 2018 WL 505071, at *5 & n. 4 (E.D.N.C. Jan. 22, 2018) (unpublished) (collecting cases).

[8] "This court need not conduct a separate analysis under the First Amendment because RLUIPA requires a higher degree of proof than the First Amendment standard." *Rogers*, 2017 WL 4246866, at *9.

[9] For the same reasons, Plaintiff claims for violation of his North Carolina constitutional rights should be dismissed. *In re Williams*, 269 N.C. 68, 78, 152 S.E.2d 317, 325 (1967) (noting that "the freedom protected by this provision of the State Constitution is no more extensive than the freedom to exercise one's religion, which is protected by the First Amendment to the Constitution of the United States.").

admissible evidence sufficient to support a due process violation. (Docket Entry 47 at 16-19.) To state a procedural due process claim, Plaintiff must demonstrate that he "had a constitutionally cognizable life, liberty, or property interest." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (citation omitted). Plaintiff must then show that he was deprived of that interest by Defendants and "that the procedures [they] employed were constitutionally inadequate." *Id.* (internal quotations and citation omitted). "[W]hile a state statute or policy may create liberty interests giving rise to Due Process protection, this is so only if the denial of such an interest imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Prieto v. Clarke*, 780 F.3d 245, 249 (4th Cir. 2015) (internal quotations and citation omitted).

Here, Plaintiff's arguments surrounding his validation as an NGE member, continued improper classification, and failure to review his SRG status do not demonstrate a due process violation. First, as previously stated, Defendant Brown was not personally involved in any decisions related to the SRG designation of Plaintiff. (Brown Aff. ¶¶ 20-21.) As to Defendant Rich, his was not employed with the NCDPS when Plaintiff was initially validated in 1998. (*See* Rich Aff. ¶ 2 (employed since 2004).) During annual reviews since 2015, Plaintiff continued to meet the criteria for validation as a SRG member and thus has remained such throughout his incarceration. (*Id.* ¶¶ 12-14.) Defendant Rich last reviewed Plaintiff's SRG file on July 5, 2017, before other SOIU staff were assigned to the case. (*Id.* ¶ 20.) Based on the NCDPS policies at that time, "the SRG membership was not removed from an inmate due to the security risk that could pose to staff or operations." (*Id.* ¶ 21.) Defendant Rich admits that the NCDPS was in the process of developing a new policy such that inmates court

13

renunciate their SRG membership and have the SRG notation removed from their file, but such changes were not in place during his final review of Plaintiff's case. (*Id.*)

The evidence here does not demonstrate a violation of Plaintiff's due process rights by any actions of Defendant Rich. Plaintiff's continued SRG status was because he met the criteria for such validation based on the policy in place at the time of Defendant Rich's review. Plaintiff argues that during the July 2018 review of his SRG status, he was aware of a way in which inmates could "lower their SRG level," though the process was not afforded to him even though facility intelligence officers recommended his SRG status be removed. (*See* Docket Entry 50 at 16; *see also* Rogers Decl. ¶ 15, Docket Entry 50 at 32-33.) Even if this were true, Defendant Rich did not personally review Plaintiff's SRG case since July *2017*, after which other SOIU staff were assigned to review the case. (*See* Rich Aff. ¶ 20.) Moreover, Defendant Rich admits that the NCDPS was in the process of developing new policies regarding inmates with SRG designations. (*Id.* ¶ 21.) Nevertheless, such new changes were not in place during his final review of Plaintiff's 2017 file. (*Id.*) As such, there is no due process violation on the part of Defendant Rich and Defendants are entitled to summary judgment on such claim.

### C. Official Capacity Claims

Defendants also argue that to the extent Plaintiff seeks monetary damages against them in their official capacities, it is barred by the doctrine of sovereign immunity. (Docket Entry 47 at 19-20.) The Eleventh Amendment prohibits actions in federal court by individuals against a state unless the state has consented to suit or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity. *Ballenger v. Owens*, 352 F.3d 842, 844-45 (4th Cir.

14

Case 1:19-cv-00417-WO-JLW Document 51 Filed 08/11/22 Page 14 of 17

2003). The doctrine of sovereign immunity under the Eleventh Amendment applies not only to actions in which the State of North Carolina is a named defendant, but also to actions against its departments, institutions, and agencies. *DeMurry v. N.C. Dep't of Corrs.*, 195 N.C. App. 485, 492-93, 673 S.E.2d 374, 380-81 (2009). Additionally, in North Carolina, "[a]ctions against officers of the State in their official capacities are actions against the State for the purposes of applying the doctrine of [sovereign] immunity." *Green v, Kearney*, 203 N.C. App. 260, 268, 690 S.E.2d 755, 762 (2010) (citation omitted). Indeed, "[w]here [Section 1983's] provisions allow for suit against a 'person,' and in suits for money damages, neither the state nor a state agency is deemed a 'person,' [thus] this claim cannot be maintained by plaintiff against [the State]." *Savage v. N. Carolina Dep't of Corr.*, No. 5:06-CV-171-FL, 2007 WL 2904182, at *5 (E.D.N.C. Sept. 29, 2007) (unpublished).

Here, to the extent Plaintiff has filed suit against Defendants in their official capacities, it would be against the NCDPS. *Green*, 203 N.C. App. at 268, 690 S.E.2d at 762. The NCDPS, as an agency of the State of North Carolina, has not consented to suit nor waived immunity. Thus, Defendants should be entitled to summary judgment on Plaintiff's claims to the extent he seeks monetary damages against them in their official capacities under § 1983.[10]

---

[10] As to any claim under RLUIPA, the Fourth Circuit has held that RLUIPA only authorizes injunctive relief against a state official, irrespective of whether the individual is sued in his or her individual or official capacity. *See Wall v. Wade*, 741 F.3d 492, 496 n.5 (4th Cir. 2014) ("We note at the forefront that Congress did not authorize damages claims against state officials under RLUIPA.); *See Sossamon v. Texas*, [563] U.S. [277, 284-88] . . . (2011) (prohibiting damages claims against state officials in their official capacity); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity) Therefore, the plaintiff's only potential remedies under RLUIPA are equitable."). As previously stated, Plaintiff's RLUIPA claim fails.

15

## D. Qualified Immunity

Lastly, Defendants argue that they are entitled to qualified immunity for any money damages in their individual capacity. (Docket Entry 47 at 20.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983[.]"). Thus, the traditional two-step qualified immunity inquiry requires a court to determine: "(1) whether the official violated a constitutional right; and if so, (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010) (citation omitted). In evaluating qualified immunity, a court initially may determine whether the plaintiff has alleged or shown a violation of a constitutional right at all. *See Pearson v. Callahan*, 555 U.S. 223 (2009).[11]

Here, Plaintiff has not demonstrated a constitutional violation. Thus, Defendants are entitled to qualified immunity. *See Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007) (finding that "[i]f [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there").

---

[11] In *Pearson*, the Supreme Court overruled the mandatory two-step sequence adopted in *Saucier v. Katz*, 533 U.S. 194 (2001), in analyzing qualified immunity. Thus, after *Pearson*, courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances . . . ." *Pearson*, 555 U.S. at 236.

## III. CONCLUSION

For the reasons stated herein, **IT IS RECOMMENDED** that Defendants Betty Brown and Chris Rich's Motion for Summary Judgment (Docket Entry 46) be **GRANTED** and that this action be dismissed.

Joe L. Webster
United States Magistrate Judge

August 11, 2022
Durham, North Carolina